No. 06-2306

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

FOREST GUARDIANS and
CARSON FOREST WATCH,

Plaintiffs-Appellants,

v.

UNITED STATES FOREST SERVICE,

Defendant-Appellee.

Oral Argument Requested

On Appeal from the United States District Court
for the District of New Mexico, Judge James O. Browning
No. CIV 05-0372 JB/DJS

**BRIEF OF APPELLEES**

RONALD J. TENPAS
Acting Assistant Attorney General

OF COUNSEL:

KATHRYN TOFFENETTI
MARY ANN JOCA
Office of General Counsel
U.S. Dept. of Agriculture

ANDREW A. SMITH
MARK R. HAAG
DAVID C. SHILTON
Attorneys
Environment & Natural Resources Division
Department of Justice
Washington, D.C. 20026
202-514-5580

# TABLE OF CONTENTS

**Page**

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      I.      Statutory and Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . 2

            a.      The National Forest Management Act . . . . . . . . . . . . . . . . . . . 2

            b.      Forest Service Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            c.      The Carson National Forest Plan . . . . . . . . . . . . . . . . . . . . . . . 6

                  1.      The Monitoring Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                  2.      The Forest Plan's provisions regarding the Abert's squirrel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      II.     Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            a.      The Agua Caballos Projects . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      III.    Agency proceedings and administrative appeals . . . . . . . . . . . . . . 14

      IV.    Proceedings below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    FOREST GUARDIANS FAILED TO EXHAUST ITS CLAIM THAT
      THE FOREST SERVICE DID NOT APPLY THE "BEST
      AVAILABLE SCIENCE" STANDARD OF THE 2000
      TRANSITIONAL REGULATION . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.    Exhaustion of administrative remedies is mandatory; any
            claims not raised in the administrative process cannot be
            brought in court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      B.    Forest Guardians' arguments that this Court should disregard
            the statutory exhaustion requirement are unpersuasive . . . . . 28

II.   THE AGUA CABALLOS PROJECTS ARE CONSISTENT WITH
      NFMA REQUIREMENTS RELATING TO SPECIES
      DIVERSITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      A.    NFMA's species diversity requirement does not apply directly
            to individual projects  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      B.    Even if the species diversity requirement of NFMA applied
            directly to projects, the record demonstrates that the Agua
            Caballos projects comply.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.  THE AGUA CABALLOS PROJECTS ARE CONSISTENT WITH
      THE CARSON NATIONAL FOREST PLAN . . . . . . . . . . . . . . . . 47

      A.    As the Carson Forest Plan does not condition project approval
            on compliance with monitoring goals, Forest Guardians' claim
            of deficient monitoring is not cognizable  . . . . . . . . . . . . . . 48

      B.    The Agua Caballos Projects are fully consistent with the
            substantive direction of the Carson Forest Plan . . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Statutory and Regulatory Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61

# TABLE OF AUTHORITIES

**Page**

BAR MK Ranches v. Yuetter, 994 F.2d 735 (10th Cir. 1993) . . . . . . . . . . . . . . . 23

Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . 26

Bowen v. City of New York, 476 U.S. 467 (1986) . . . . . . . . . . . . . . . . . . . . . . . 34

City of Gillette, Wyoming v. FERC, 737 F.2d 883 (10th Cir. 1984) . . . . . . . . . . 23

Colo. Envtl. Coalition v. Dombeck, 185 F. 3d 1162 (10th Cir. 1999) . . . . . . . . . 3

Cudjoe v. Indep. School Dist. No. 12, 297 F.3d 1058 (10th Cir. 2002) . . . . . . . . 26

Dickinson v. Zurko, 527 U.S. 150 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 21,22,43

Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922 (9th Cir. 1999) . . . . . . . . . 49

Forest Guardians v. USFS, 2006 WL 4109661
        (D.N.M. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

Forest Guardians v. USFS, 495 F.3d 1162 (10th Cir. 2007) . . . . . . . . . . . . . . 25,27

Forest Watch v. USFS, 410 F.3d 115 (2d. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 34

Frontier Airlines v. Civil Aeronautics Board, 621 F.2d 369
        (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,30

Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957(9th Cir. 2002) .  38,42

INS v. Elias-Zacarias, 502 U. S. 478 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Jones v. Bock, 549 U.S. ___ (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Kleissler v. U.S. Forest Service, 183 F.3d 196 (3d Cir. 1999) . . . . . . . . . . . . . . 26

iv

**Cases**                                                          **Page**

Kleppe v. Sierra Club, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lamb v. Thompson, 265 F.3d 1038 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 22

Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989) . . . . . . . . . 22

McCarthy v. Madigan, 503 U.S. 140 (1992) . . . . . . . . . . . . . . . . . . . . . 24,25,26,29

McKart v. United States, 395 U.S. 185 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

McQueen v. Colo. Springs School Dist. No. 11, 488 F.3d 868 (10th Cir. 2007)   26

Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059 (9th Cir.2002) . . . 49

NLRB v. Columbian Stap & Enamel Co., 306 U. S. 292 (1939) . . . . . . . . . . . . 22

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004) . . . . . . . . . . . 48,49,51

Ohio Forestry Assn. v. Sierra Club, 523 U.S. 726 (1998) . . . . . . . . . . . . . . . . 3,4

SEC v. Chenery Corp., 332 U.S. 194 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

State of Utah v. Babbitt, 137 F.3d 1193 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . 21

Stinson v. United States, 508 U.S. 36 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United Envtl. Cong. v. Bosworth, 372 F.3d 1219 (10th Cir. 2004) . . . . . . 19,33,34

United Envtl. Cong. v. Bosworth, 439 F.3d 1184
     (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,53

United Envtl. Cong. v. Bosworth, 443 F.3d 732
     (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,49,54

United Envtl. Cong. v. Troyer, 479 F.3d 1269 (10th Cir. 2007) . . . . . . . . . . . . . 34

**Cases**                                                                **Page**

Utah Envtl. Congress v. Richmond, 483 F.3d 1127
  (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,28,29,52,53

Wilson v. Hodel, 758 F.2d 1369 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 28

Wilson v. MVM, Inc., 475 F.3d 166 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 28

**Statutes**

Administrative Procedure Act
  5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Department of Agriculture Reorganization Act
  7 U.S.C. § 6912(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20,25,26

National Forest Management Act
  16 U.S.C. §§ 528-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  16 U.S.C. §§ 1600 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  16 U.S.C. § 1604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  16 U.S.C. § 1604(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  16 U.S.C. § 1604(g)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,37,39
  16 U.S.C. § 1604(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4
  16 U.S.C. § 1604(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,38,48,56

Sustained Yield Forest Management Act
  16 U.S.C. §§ 583a-583i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

| **Rules & Regulations** | **Page** |
|---|---|

36 C.F.R. § 215.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
36 C.F.R. § 219.35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
36 C.F.R. § 219.35(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
36 C.F.R. § 219.35(d) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

47 Fed. Reg. 43037 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
65 Fed. Reg. 67514 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
68 Fed. Reg. 53294 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
69 Fed. Reg. 58055 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**RELATED CASES**

To counsel's knowledge, there are no prior or related appeals.

## JURISDICTION

Forest Guardians and the Carson Forest Watch (collectively "Forest Guardians" or "plaintiffs") brought this case in the district court against the United States Department of Agriculture, Forest Service ("Forest Service"). The district court had jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (federal defendant). On August 22, 2006, the district court entered a final judgment resolving all claims as to all parties. Deferred Joint Appendix (App.) 6. Forest Guardians timely filed a notice of appeal on October 20, 2006. App. 6. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## ISSUES ON APPEAL

This case is a challenge to the decision by the Forest Supervisor on the Carson National Forest to undertake the Agua Caballos Projects. Forest Guardians claims that the Forest Supervisor's decision violated the National Forest Management Act of 1976, 16 U.S.C. §§ 1600 *et seq.* ("NFMA"), Forest Service regulations, and the Carson National Forest Plan. The issues on appeal are:

1)      Whether the district court properly concluded that it lacked jurisdiction over Forest Guardian's claim that the Forest Supervisor did not "consider the best available science," as required by a transitional regulation implementing NFMA, where Forest Guardians

did not raise this claim in its administrative appeal, and exhaustion is required by statute.

2)    Whether the Forest Supervisor reasonably determined that the Agua Caballos Projects, which Forest Service biologists have found will improve habitat for the Abert's squirrel in the Carson National Forest, comply with the NFMA species diversity requirement.

3)    Whether the Forest Service may proceed with an individual project before achieving tentative Forest-wide monitoring goals when the Carson National Forest Plan does not condition individual project approvals upon completion of monitoring.

## STATEMENT OF THE CASE

## I.    Statutory and Regulatory Framework

### a.    The National Forest Management Act

The National Forest System is administered by the Forest Service, an agency of the U.S. Department of Agriculture.  In 1960, Congress enacted the Multiple-Use Sustained-Yield Act, which established that the Forest Service should manage National Forest System lands for outdoor recreation, range, timber, watershed management, fish and wildlife purposes, and wilderness in a manner that the

agency deems will best meet the needs of the American people pursuant to the

principles of multiple use and sustained yield.  16 U.S.C. §§ 528-31.

The National Forest Management Act ("NFMA"), passed in 1976,

establishes a framework for the Forest Service to "develop, maintain, and, as

appropriate, revise land and resource management plans ['Forest Plans'] for units

of the National Forest System."  16 U.S.C. § 1604(a).  Pursuant to NFMA:

> Forest management occurs at two distinct levels.  At the first level, the
> Forest Service develops the Forest Plan, a broad, programmatic
> document, accompanied by an environmental impact statement and
> public review process conducted in accordance with the National
> Environmental Policy Act.  * * *  At the second level, the Forest
> Service implements the Forest Plan by approving (with or without
> modification) or disapproving particular projects * * *.  Proposed
> projects must be consistent with the Forest Plan * * * and are subject
> to further National Environmental Policy Act review.

Colo. Envtl. Coalition v. Dombeck, 185 F. 3d 1162, 1167-68 (10th Cir. 1999); see

also Ohio Forestry Assn. v. Sierra Club, 523 U.S. 726, 729-30 (1998) ("Ohio

Forestry").

Forest Plans guide all management activities on the National Forests, and

must "provide for multiple use and sustained yield of products and services"

derived from the National Forests.  16 U.S.C. § 1604(e)(1).  Forest Plans establish

broad planning goals and objectives and identify guidelines for management of

forest resources, ensuring consideration of both economic and environmental

3

factors.  <u>Id</u>. § 1604(g)(1)-(3).  As flexible guidance documents, Forest Plans may be "amended in any manner whatsoever" after adoption.  <u>Id</u>. § 1604(f)(4).

The level of Forest Service management "below" the Forest Plans, where plan standards and guidelines are applied, is that of site-specific projects.  Project-level implementation takes many forms, and all such "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."  16 U.S.C. § 1604(i).

In <u>Ohio Forestry</u>, 523 U.S. at 729-30, the Supreme Court described the relationship between the first stage of forest-wide planning and the second stage of decision-making for projects:

> Although the [Forest] Plan sets logging goals, selects the areas of the forest that are suited to timber production, and determines which "probable methods of timber harvest" are appropriate, it does not itself authorize the cutting of any trees.  Before the Forest Service can permit the logging, it must: (a) propose a specific area in which logging will take place and the harvesting methods to be used; (b) ensure that the project is consistent with the Plan; (c) provide those affected by proposed logging notice and an opportunity to be heard; (d) conduct an environmental analysis pursuant to the National Environmental Policy Act; * * * and (e) subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court.

**b.  Forest Service Regulations**

NFMA requires the Forest Service to promulgate regulations that set out the

process for the development and revision of land management plans.  16 U.S.C.

§ 1604(g).  The regulations are required to specify such things as the suitability of

lands for resource management, and provide guidelines for land management plans

which, among other things, "provide for diversity of plant and animal communities

based on the suitability and capability of the specific land area in order to meet

overall multiple-use objectives."  16 U.S.C. § 1604(g)(3)(B).  The Forest Service

promulgated planning regulations in 1982.  47 Fed. Reg. 43037 (1982).  On

November 9, 2000, the Forest Service issued a final rule creating an entirely new

regulation to govern forest planning.  65 Fed. Reg. 67514 (2000).  Included in the

2000 rule were provisions to govern a transition period from the 1982 regulation to

the 2000 regulation ("2000 transitional regulation").  36 C.F.R. § 219.35 (2001).

The 2000 transitional regulation defined the transition period as beginning

on November 9, 2000, and ending upon completion of the required revisions to the

Forest Plan of each unit of the National Forest System.  Id. § 219.35(a) (2001).

During the transition period, instead of applying the provisions of either the 1982

or 2000 regulations, the responsible official was directed to "consider the best

available science in implementing * * * the current plan."  Id.  The transitional

5

regulation also required that, beginning on November 9, 2003, site-specific

decisions conform to the substantive requirements of the 2000 regulations.  Id.

§ 219.35(d) (2000).  In 2003, the Forest Service issued an interim final rule

extending the date by which site-specific decisions must be in compliance with the

2000 regulations until the development of new final regulations that would replace

the 2000 regulations.  68 Fed. Reg. 53294 (2003).  On September 29, 2004, the

Forest Service further issued an interpretative rule to clarify that during the

transition period, site-specific decisions are to comply with the transition

provisions of the 2000 rule, and, in particular the requirement that the responsible

official consider best available science.  69 Fed. Reg. 58055 (2004).

### c.  The Carson National Forest Plan

The Forest Plan for the Carson National Forest was issued in September

1986.  The Plan "provides for integrated multiple use and sustained yield of goods

and services from the Forest in a way that maximizes long-term net public benefits

in an environmentally sound manner."  Admin. Rec. 3 at 420.  The Forest Plan

projected that the Carson National Forest would produce 32 million board feet of

timber per year between 1986 and 1995 and 40 million board feet per year between

1995 and 2001.  App. 196.  In reality, harvest levels have been far lower and have

averaged only approximately one third of the projected harvest levels.  Id.

### 1.  The Monitoring Plan

The Carson National Forest Plan includes a monitoring plan.  App. 140-149.
The monitoring plan explains that, "[t]he purpose of monitoring and evaluating the
implementation of the Forest Plan is to inform the decision maker of the progress
toward achieving the goals, objectives, and standards and guidelines."  App. 140.
It provides that an annual monitoring action program will be prepared and will
include details of the monitoring to be accomplished based on available funds.  <u>Id</u>.
The results of the monitoring program are to be analyzed by an inter-disciplinary
team which may then make recommendations to the Forest Supervisor to amend or
revise the Forest Plan.  App. 140-41.

The monitoring plan calls for monitoring a number of resources and uses,
including recreation, facilities, timber and range.  In the wildlife category, one of
the items to be monitored is the population and habitat trends of management
indicator species (MIS).  App. 142.  MIS are species that are chosen as bellwethers
for other species that have the same special habitat needs or population
characteristics.  <u>United Envtl. Cong. v. Bosworth</u>, 439 F.3d 1184, 1190 (10th Cir.
2006) ("<u>UEC 2</u>").  The Abert's squirrel is one such species.  The plan calls for five
years of baseline monitoring and then periodic monitoring of populations and
trends, including through cooperative studies with State wildlife officials.  App.

7

145-47.  Monitoring species fulfills several purposes, such as providing feedback to determine if objectives are being met, but none of the stated purposes is tied directly to individual projects.  App. 143.

### 2.  The Forest Plan's provisions regarding the Abert's squirrel.

The Carson National Forest Plan also includes substantive goals with respect to wildlife, including the Abert's squirrel.  The wildlife section of the Forest Plan begins with the goal of "[m]aintain[ing] habitat for viable populations of all wildlife and fish species found on the Forest and improv[ing] habitat for selected species."  App. 135.  It explains that, "[t]his will be accomplished indirectly through intensive coordination of habitat manipulation with other resource activities, and directly through intensive habitat management."  Id.

In order to accomplish its goals, the Forest Plan calls on the Forest Service to "[e]stablish and maintain stand diversity though integrated stand management to maintain and improve wildlife habitat diversity and specific habitat components in lands suitable for timber and firewood production."  App. 136.  In designing timber sales, the Forest Service is instructed to "evaluate [the qualities of each stand] against the wildlife habitat objectives established for the diversity unit."  Id.

8

With respect to the Abert's squirrel, the Forest Plan states that:

> By creating a diversity of stand conditions and providing juxtaposition of stands over time and space, suitable habitat components of Abert and red squirrels will be maintained over time. During the intensive reconnaissance phase of integrated stand management State and Federal biologists should identify those stands where squirrel activity is especially high and recommend deferment of cutting during the entry.

App. 137. Through this prescription, the Forest Plan contemplates that the forest will be actively managed in order to maintain Abert's squirrel habitat.

## II.  Statement of Facts

### a.  The Agua Caballos Projects

The Agua Caballos Projects ("Projects") are silvicultural treatments and related activities on the El Rito Ranger District, Carson National Forest, within Rio Arriba County in northern New Mexico, approximately six miles north of the small mountain community of El Rito and adjacent to the village of Vallecitos.  App. 151.  To assess potential environmental and other effects, the Forest Service designated an analysis area of 23,767 acres for the Projects.  App. 246.  Of these acres, the selected alternative for the Projects calls for harvests of sawtimber on only 3,884 acres and allocates 20 percent of the analysis area as retained old growth.  Id.  Elevations in the analysis area range from approximately 7,000 feet

9

near the eastern boundary to over 9,800 feet at the extreme northwest corner. App. 151. The analysis area consists of several vegetation types, including 68 percent ponderosa pine, 17 percent mixed conifer, 6 percent high elevation grassland, 4 percent aspen, 4 percent piñon-juniper woodland, and 1 percent spruce-fir. Id.

The purpose of the Projects is to address adverse forest conditions that developed as a result of intensive logging in the early 1900s, livestock grazing, and fire suppression. App. 151-52. These historical activities led to the establishment of dense stands of trees of the same age that are growing slowly due to limited space and competition for water, light, and nutrients. App. 152. These high tree density conditions prevent trees from "releasing," or growing into the large trees typical of mature and old growth forest stands that provide habitat for a number of species on the forest. In addition, the existing dense stands are characterized by moderate to high concentrations of materials that could serve as fuels for damaging and dangerous forest fires. Id.

Because of these conditions, the analysis area for the Projects presently lacks the diversity of forest stand structures and age classes conducive for a healthy, functioning ecosystem of plants and wildlife. For example, in ponderosa pine areas, the forest is dominated by tree stands stalled in two of the six vegetation structural stages ("VSS") that the Forest Service uses to describe forest conditions,

10

where VSS 1 represents grasses, forbs, and shrubs and VSS 6 represents old forest.[1]  While the Forest Plan for the Carson National Forest calls for a more even distribution of forest stands across the VSS scale, 90 percent of the ponderosa pine in the analysis area is dominated by stands in VSS 3 and VSS 4.  App. 153.  The Projects were developed "to improve the health of ponderosa pine stands" by "mov[ing] stands out of VSS classes 3 and 4 and into the larger and smaller classes."[2]  Id.  The result will be "more diversity in composition across the landscape—including clumps of trees interspersed with small openings and a healthy distribution of grasses, forbs and shrubs in the forest understory."  Id.

Several of the claims made in Forest Guardians' statement of the facts merit correction and clarification.  Forest Guardians references the FEIS and claims that between 1986 and 2000, "the USFS 'actively managed' 7% of the remaining interlocking canopy ponderosa pine habitat 'for timber production.'"  Br. 12 (citing App. 157).  In fact, the FEIS states, "approximately 7 percent of the potential

_____

[1] "Vegetation structural stage [VSS] is a generalized description of forest growth and aging stages based on the majority of trees in the specific diameter distribution of the stand."  App. 152.

[2] "The thinning from below would remove many smaller diameter trees and increase the average stand diameter * * * .  Commercial thinning in the VSS 3 and 4 classes would increase the growth of the residual trees in the stand and reduce the amount of time by as much as one-half for a stand to grow into VSS classes 5 and 6.  The treatments in VSS 5 would reduce the amount of time for a stand to move to VSS 6."  App. 154.

Abert's squirrel habitat [across the forest] has been actively managed for timber production." The Forest Service describes potential habitat as the ponderosa pine that exists across the Forest, regardless of the presence or absence of interlocking canopies. App. 201. Thus, the 7 percent figure represents all of the ponderosa pine stands across the Carson National Forest that were treated, not just those with interlocking canopies.

Forest Guardians further claims the Agua Caballos Projects contemplate "degradation or destruction of 24% of this important rare habitat type." Id. First, the projects do not contemplate "degradation or destruction;" the Agua Caballos Projects call for selective thinning, not clear cutting. Second, while the Forest Service has stated that this habitat type is not as prevalent as desired across the forest, App. 201, this habitat type is not "rare," and the Projects are designed to increase it.[3] Third, 47 percent (7,613 acres) of the 24 percent quoted by Forest Guardians is in VSS 3 ponderosa pine stands, used mostly for foraging, not for nesting, and is not considered rare. App. 155. In fact, out of the 7,613 acres, only 36 acres of VSS 5 with interlocking canopies of greater than 60 percent (important

_____

[3] Forest Guardians also states that Forest Service Planning documents designate 77,000 acres as the amount of "essential habitat for the Abert's squirrel." Br. at 11. In fact, this number comes from a 1982 document and was not incorporated in the Carson National Forest Plan nor the Environmental Impact Statement ("EIS") for the Plan. It is also inconsistent with current literature on Abert's squirrel population levels.

nesting and foraging habitat) will be treated, and that treatment will not reduce

canopy closures to less than 50-55 percent.  App. 346-47.  None of VSS 6 (old

forest) stands will be treated.  Id.  And, while the Projects will move 1,138 acres of

ponderosa pine below the 60 percent canopy closure (the majority of which is

currently in VSS 3), it will benefit 1,861 acres of existing habitat and move 2,043

acres towards larger trees with interlocking canopies.  App. 250.

In addition to their environmental benefits, the Agua Caballos Projects will

provide a much-needed supply of timber to one of the poorest communities in New

Mexico.  Most of the Agua Caballos analysis area is within the Vallecitos Federal

Sustained Yield Unit, which was established in 1948 in accordance with the

Sustained Yield Forest Management Act of 1944, 16 U.S.C. §§ 583a-583i.  The

Unit includes approximately 73,400 acres of National Forest System lands, of

which approximately 55,100 acres are classified as suitable for timber

management.  App. 158.

The primary purpose of the Vallecitos Sustained Yield Unit is to provide a

supply of timber and other forest products to help maintain a stable economy for

Vallecitos and nearby areas.  Id.  Wood product sales from the Unit are designed to

provide local residents with an opportunity to establish a wood products business;

to maintain steady employment opportunities in the Vallecitos community and

13

nearby areas; and to provide opportunity for those living within and near the Unit

to obtain lumber for their local requirements.  Id.  In order to achieve these

objectives, sawtimber from the Unit is sold only to approved responsible operators.

Such operators are required to maintain a primary manufacturing facility within the

employment area as defined in the Forest Plan.  Id.  They are also obligated to

permit local people to buy timber from the plant for their personal use, and bona

fide residents of the local area must fill 95 percent of all nonsupervisory jobs.  Id.

## III.    Agency proceedings and administrative appeals

The Forest Service started its planning efforts for the Agua Caballos Projects

in 1992.  App. 169.  On June 3, 2002, following completion of an EIS, Forest

Supervisor Martin Chavez authorized the Projects in a Record of Decision.  See

App. 166-74.  On August 19, 2002, several parties, including Forest Guardians,

filed administrative appeals of the Supervisor's decision.  See App. 177-89.  The

parties claimed that the Forest Service had not complied with the National

Environmental Policy Act ("NEPA"), NFMA's substantive and procedural

requirements, or the 1982 NFMA regulations.  Id.  On October 1, 2002, the Deputy

Regional Forester granted the appellants' request for relief and reversed the Forest

Supervisor's decision, on grounds that the MIS analysis was incomplete.  See App.

192.  The Deputy Regional Forester instructed the Forest Service to complete the

14

MIS analysis and circulate a supplemental EIS for public comment.  App. 193.

The Forest Supervisor circulated a Supplement to the Final EIS ("SFEIS") in June 2003, with an updated Forest-wide Management Indicator Species Assessment for the Carson National Forest, and sought comments.  App. 210-11. On April 13, 2004, the Forest Supervisor issued the Final SFEIS, see App. 246-50, and signed a new Record of Decision that reauthorized the Agua Caballos Projects, see App. 286-304.

On July 12, 2004, Forest Guardians filed an administrative appeal of the reauthorization.  See App. 252.  The appeal raised similar issues as the previous appeal, including allegations of violation of NFMA and NFMA regulations. However, as discussed infra at 27, the appeal did not claim that the Forest Service should have applied the 2000 transitional regulation's "best available science" standard.  Id.  On August 26, 2004, Deputy Regional Forester Abel M. Camarena denied Forest Guardians' appeal, and affirmed the reauthorization of the Agua Caballos Projects.  See App. 269-70.

## IV.    Proceedings below

Forest Guardians filed this action on April 4, 2005, and on September 1, 2005, filed a Motion for Preliminary Injunction.  Forest Guardians alleged that the Forest Service had violated NFMA, the National Environmental Policy Act

15

(NEPA), and the Administrative Procedure Act (APA), and asked the Court to enjoin the continuation of the Agua Caballos Projects.  App. 50, <u>Forest Guardians v. USFS</u>, 2006 WL 4109661 (D.N.M. 2006).  The district court denied Forest Guardians' motion for preliminary injunction on September 26, 2005.  App. 3.  The parties subsequently briefed the merits of the case.  After a hearing on the merits, the district court granted judgment for the Forest Service on all issues.   App. 50-103.

The district court's decision comprehensively addressed Forest Guardians' claims that the Projects violated NFMA and the regulations implementing NFMA, and were inconsistent with the Carson National Forest Plan.  The court first held that the 1982 regulations were inapplicable to the Agua Caballos Projects because they had been replaced in 2000 by a transitional regulation imposing a "best available science" standard.  App. 75-78.  The court rejected Forest Guardians' contention that the Carson Forest Plan had adopted the MIS requirements of the 1982 regulations, finding that the Plan did not specifically incorporate these requirements.  <u>Id</u>. App. 78.  On appeal, Forest Guardians does not challenge the district court's determination that the 1982 regulations are inapplicable.

The district court next held that Forest Guardians could not pursue a claim that the Projects violated the "best available science" standard of the 2000

16

regulations because it failed to exhaust administrative remedies by raising this claim in its administrative appeal.  App. 79-88.  The district court noted that the applicable exhaustion requirement is statutory, and accordingly "is mandatory." App. 82.  The court pointed out that the 2000 regulations clearly raised the possibility that the "best available science" standard could apply to project implementation during the transition period, and that there was no excuse for Forest Guardians not to have raised this issue in its appeal.  App. 86-87.

The district court next held that the Carson Forest Plan's monitoring requirements did not constitute a condition precedent to project approval, and thus Forest Guardians' claim of deficient monitoring was not cognizable.  App. 88-94. Turning to the substantive mandate of NFMA, the court held that the Forest Service complied with NFMA's diversity requirement because the Forest Service was "rational in concluding that the planned project will create a more diverse habitat for the Abert's squirrel, and will provide higher quality habitat and better foraging opportunities[.]" App. 96.  The district court stated that regardless of the general trend of the Abert's squirrel population, Forest Guardians had not demonstrated that the Agua Caballos Projects would have an adverse effect on the Abert's squirrel.  App. 97-100.

The district court declined to address the merits of the Forest Guardians'

17

NEPA claims because, as the court explained, "Forest Guardians did not raise these claims with the USFS before bringing the claims to federal court and therefore failed to exhaust the administrative process."  App. 101.  Forest Guardians does not pursue its NEPA claim on appeal.

Having resolved all disputes in favor of the Forest Service, the court entered judgment for the Forest Service.  This appeal followed.

## SUMMARY OF ARGUMENT

1.  Forest Guardians failed to exhaust the administrative process with respect

to its claim that the Forest Service did not apply the proper regulatory standard.

Unlike waiver rules, which are judicially created, the exhaustion requirement in

this case is mandated by a statute, 7 U.S.C. § 6912(e).  Accordingly, Forest

Guardians' policy-based arguments against applying exhaustion principles are

inapplicable.

Even if failure to exhaust could be excused in some cases, it should not be

excused here.  The plain language of the 2000 transitional regulation put Forest

Guardians on notice of the potential applicability of the "best available science"

standard.  Moreover, the Forest Supervisor's Record of Decision specifically stated

that, "[t]he monitoring plan, like the EIS, is based on the best available scientific

information at the time," App. 291, which should have alerted Forest Guardians to

the need to specifically raise any claim that the Forest Service had not, in fact,

considered the best available science standard.  Finally, this Court's decisions,

particularly United Envtl. Cong. v. Bosworth, 372 F.3d 1219 (10th Cir. 2004)

("UEC 1"), made it plain that the standards of the 1982 regulations had been

replaced with the "best available science" standard of the 2000 transitional

regulation.  The district court properly concluded that the exhaustion mandate of  7

19

U.S.C. § 6912(e) required Forest Guardians to raise its contention that the Forest Service was using the wrong regulatory standard during Forest Guardians' administrative appeal.

2. The Agua Caballos Projects comply with NFMA's species diversity requirement. The Projects are designed to improve forest health and biodiversity. Based on substantial information and analysis in the Administrative Record, the Forest Service reasonably concluded that the Abert's squirrel would benefit from the implementation of the Agua Caballos projects, because the silvicultural treatments will create a more diverse habitat for the squirrel, providing higher quality habitat and better foraging opportunities. This determination is well within the expert discretion of the Forest Service, and Forest Guardians has fallen far short of showing that the determination is arbitrary or capricious, or unsupported by substantial evidence.

3. While the monitoring plan attached to the Carson Forest Plan contains general forest-wide goals for species monitoring, the Forest Plan specifically indicates that such monitoring is not appropriate at the site-specific scale and does not condition approval of projects on achievement of monitoring goals. Accordingly, Forest Guardians fails to state a cognizable claim of violation of the Forest Plan's monitoring requirements.

20

Moreover, the Agua Caballos Projects are fully consistent with the substantive requirements of the Forest Plan, and directly track the Plan's provisions for Abert's squirrel. Forest Guardians has failed to establish any violation of NFMA or the Plan, and the district court's judgment should be affirmed.

## STANDARDS OF REVIEW

This Court reviews the district court's decision affirming approval of the Agua Caballos Projects *de novo*. Utah Envtl. Congress v. Richmond, 483 F.3d 1127, 1134 (10th Cir. 2007) ("Richmond"). Where a statute, such as NFMA, does not provide for a private right of action, the APA, 5 U.S.C. § 701 *et. seq.*, provides for judicial review of agency actions. See, e.g., State of Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998). Under the Administrative Procedure Act, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the APA, an agency's factual conclusions are reviewable for whether they are supported by "substantial evidence." Dickinson v. Zurko, 527 U.S. 150, 164 (1999). That standard is more deferential than the "clearly erroneous" standard for review of trial court findings. See id. at 162, 164. Under the substantial evidence test, the agency's decision must be sustained unless a "reasonable factfinder" would have to conclude to the contrary. See INS v. Elias-Zacarias, 502

21

U. S. 478, 481 (1992). The evidence must be enough, in terms of sufficiency, "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Stap & Enamel Co., 306 U.S. 292, 300 (1939); see also Zurko, 527 U.S. at 162.

A deferential approach is particularly appropriate where the challenged decision implicates substantial agency expertise. See, e.g., Lamb v. Thompson, 265 F.3d 1038, 1041-42 (10th Cir. 2001) (recognizing "the 'highly complex' issues raised by the management of the national forests"). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989). "Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" Id. at 377 (citing Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)). Thus, Forest Guardians' burden in establishing that the Forest Service's conclusions concerning the effects of the Agua Caballos Projects were erroneous is particularly heavy.

When a federal agency such as the Forest Service interprets its own regulations, its interpretation is afforded special consideration. "[A]n agency's

22

interpretation of its own regulations, including its procedural rules, is entitled to great deference." <u>BAR MK Ranches v. Yuetter</u>, 994 F.2d 735, 738 (10th Cir. 1993) (citing <u>City of Gillette, Wyoming v. FERC</u>, 737 F.2d 883, 884-85 (10th Cir. 1984)).  Pursuant to this highly deferential standard, a federal court may reject an agency's interpretation of its own regulations only when the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." <u>BAR MK Ranches</u>, 994 F.2d at 738; <u>see also  Stinson v. United States</u>, 508 U.S. 36, 45 (1993) ("[p]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (quotation omitted).

**ARGUMENT**

I.    **FOREST GUARDIANS FAILED TO EXHAUST ITS CLAIM THAT THE FOREST SERVICE DID NOT APPLY THE "BEST AVAILABLE SCIENCE" STANDARD OF THE 2000 TRANSITIONAL REGULATION.**

Forest Guardians contends (Br. 36) that the district court erred by not ruling on its claim "that the USFS's failure to use the governing 'best available science' standard during A-C project planning and decision-making is arbitrary and capricious."  Forest Guardians concedes that it did not raise this issue in its administrative appeal.  See <u>infra</u> at 27.  But even though Forest Guardians insists that the Forest Service was bound to apply the "best available science" standard as it planned and approved the Projects in the years between 2000 and 2004, it asks this Court to excuse its failure to raise this issue in its July 2004 administrative appeal, arguing that it could not have known about the applicability of the "best available science" standard at that time.  As we show below, Forest Guardians' attempt to excuse itself from the statutory requirement to exhaust claims on this basis cannot succeed.

24

A.    **Exhaustion of administrative remedies is mandatory; any claims not raised in the administrative process cannot be brought in court.**

"Where Congress specifically mandates, exhaustion is required." <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144 (1992).  With respect to decisions of the Department of Agriculture, Congress has specifically mandated:

> **Exhaustion of administrative appeals**.  Notwithstanding any other provision of law, a person <u>shall</u> exhaust <u>all</u> administrative appeal procedures established by the Secretary or required by law *before* the person may bring an action in a court of competent jurisdiction against - (1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department.

Department of Agriculture Reorganization Act, 7 U.S.C. § 6912(e) (emphasis added).[4]  Under this statute, "[p]laintiffs must exhaust administrative procedures before filing suit against USFS." <u>Forest Guardians v. USFS</u>, 495 F.3d 1162, 1170 (10th Cir. 2007).  "In order to satisfy the exhaustion requirements, a plaintiff must

---

[4] Regulations promulgated by the Secretary of Agriculture mandate that project decisions documented in a Record of Decision are subject to an administrative appeal,  36 C.F.R. § 215.11, and require appellants to provide "sufficient project- or activity-specific evidence and rationale, focusing on the decision, to show why the Responsible Official's decision should be reversed." <u>Id</u>. § 215.14.  The regulations further specify that, "[i]t is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in this part." <u>Id</u>. § 215.21.

25

present its claim to USFS in sufficient detail to allow the agency to rectify the alleged violation." Id.

Courts have distinguished between judicially created exhaustion and statutorily mandated exhaustion. While in McCarthy, the Court balanced the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion, it did so only "[b]ecause Congress has *not required* exhaustion * * *." McCarthy, 503 U.S. at 152. Such balancing would not be appropriate here.

> [T]he statutory provision mandating exhaustion contained in 7 U.S.C. § 6912(e) is explicit. Indeed, as one court has observed, "[i]t is hard to imagine more direct and explicit language requiring that a plaintiff suing the Department of Agriculture, its agencies, or employees, must first turn to any administrative avenues before beginning a lawsuit."

Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998); see also Kleissler v. U.S. Forest Service, 183 F.3d 196, 202 (3d Cir. 1999) ("the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court").[5]

---

[5]  This Court has held that statutorily required exhaustion is jurisdictional. See Cudjoe v. Indep. School Dist. No. 12, 297 F.3d 1058, 1063 (10th Cir. 2002); see also Wilson v. MVM, Inc., 475 F.3d 166, 175 (3rd Cir. 2007) ("Regardless of whether there is a compelling reason a plaintiff failed to exhaust, a court is without subject matter jurisdiction to hear the plaintiff's claim."). In McQueen v. Colo.

As Forest Guardians concedes, its administrative appeal of the decision to approve the Agua Caballos Projects did not raise any claim that the Forest Service failed to comply with the 2000 transitional regulation and their "best available science" standard. See Forest Guardians' Brief in Response to the Court's Concern Regarding Exhaustion, Doc. 66 at 6 ("Forest Guardians acknolwedges [sic] that its administrative appeal did not raise the issue that the Forest Service failed to apply the 2000 transitional regulations during the administrative process"). Because exhaustion is <u>statutorily required</u> and Forest Guardians failed to raise the issue of compliance with the 2000 transitional regulation during the administrative process, the district court correctly dismissed the claim based on this regulation. Any other result would contravene the express congressional determination that the Forest Service be given an opportunity to correct alleged errors before judicial review, and would improperly usurp the Forest Service's congressionally-delegated function of

---

<u>Springs School Dist. No. 11</u>, 488 F.3d 868, 873 (10th Cir. 2007), this Court noted the Supreme Court's decision in <u>Jones v. Bock</u>, 127 S. Ct. 910 (2007), which held that in the context of the Prisoner Litigation Reform Act, statutorily mandated exhaustion is not jurisdictional but is an affirmative defense. As in <u>McQueen</u>, this distinction does not matter in this case because the Forest Service here clearly raised the exhaustion issue below as an affirmative defense. Cf. <u>Forest Guardians v. USFS</u>, 495 F.3d at 1170 n.7 (upholding rejection of NFMA claim against Forest Service based on Forest Guardians' failure to exhaust, even though Forest Service did not raise exhaustion in district court, and noting (without deciding issue) that some courts have treated exhaustion as jurisdictional).

resolving highly technical controversies such as presented in this case.  See <u>Wilson</u> <u>v. Hodel</u>, 758 F.2d 1369, 1372 (10th Cir. 1985) ("'[a] reviewing court usurps the agency's function when it sets aside the administrative determination on a ground not theretofore presented * * *'") (quoting <u>Unemployment Comp. Comm'n of</u> <u>Territory of Alaska v. Aragan</u>, 329 U.S. 143, 155 (1946)).

**B.      Forest Guardians' arguments that this Court should disregard the statutory exhaustion requirement are unpersuasive.**

Even if exhaustion were not mandatory here, Forest Guardians could not prevail, as its arguments for excusing its failure to exhaust are unpersuasive. Forest Guardians first claims that this Court's decision in <u>Utah Envtl. Congress v.</u> <u>Richmond</u>, 483 F.3d 1127 (10th Cir. 2007) ("<u>Richmond</u>"), stands for the proposition that because application of the proper planning standard is a legal matter, this Court should consider a claim of application of an erroneous standard even where the claim was not raised before the agency.  Br. at 47.  In <u>Richmond</u>, however, this Court simply considered what to do when a case brought into conflict two established lines of judicial precedent based on *judicially established* rules—precedent requiring plaintiffs to raise arguments in the district court before raising them on appeal, and precedent barring courts from affirming agency decisions based on reasoning the agency itself never considered.  483 F.3d at

28

1136.[6] <u>Richmond</u> did not consider, and the Forest Service did not raise, the statutory requirement that plaintiffs must exhaust the administrative process before raising an issue in court.  Indeed, none of this Court's recent decisions on the application of the 2000 transitional regulation address the question of exhaustion of administrative remedies.

Second, Forest Guardians argues (Br. 47) that when an administrative agency has made its view of a dispositive issue known and no agency technical expertise would be helpful to a reviewing court, exhaustion is not required.  Forest Guardians relies on three cases for this proposition:  <u>Frontier Airlines v. Civil Aeronautics Board</u>, 621 F.2d 369 (10th Cir. 1980), <u>McCarthy</u>, and <u>McKart</u>.  All three are easily distinguishable and the differences are dispositive.  In both <u>McCarthy</u> and <u>McKart</u>, there was no statutory exhaustion requirement at issue and thus the Court could exercise discretion in deciding whether or not to require exhaustion.  <u>McCarthy</u>, 503 U.S. 140, 152 ("Because Congress has not <u>required</u>

---

[6] Forest Guardians confuses the issue by arguing (Br. 47) that "[e]xhaustion of the <u>Chenery</u> issue is not required."  <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947) ("<u>Chenery</u>"), stands for a principle of judicial review – that a reviewing court "may not affirm an agency decision based on reasoning that the agency itself never considered."  <u>Richmond</u>, 483 F.3d at 1136.  It is not a substantive rule applicable to agencies, and accordingly there is no need to "exhaust the <u>Chenery</u> issue," as Forest Guardians puts it.  The issue that had to be exhausted was whether the agency was arbitrary and capricious in allegedly not applying the "best available science" standard.

exhaustion of a federal prisoner's <u>Bivens</u> claim, we turn to an evaluation of the individual and institutional interests at stake in this case") (emphasis in original) (1992); <u>McKart v. United States</u>, 395 U.S. 185, 207 n.2 (1969) ("The administration of the draft laws, however, is not covered by the APA, and the necessity for exhausting appellate remedies would seem to rest on the general doctrine developed by the courts").  In <u>Frontier Airlines</u>, while there was a statutory requirement, it was a flexible one, requiring exhaustion "unless there was reasonable grounds for failure to [exhaust]."  621 F.2d 369, 369 (10th Cir. 1980).  The instant case is governed by a statute that requires exhaustion and contains no exceptions.  Moreover, allowing a plaintiff to present such a technical question as whether the agency considered the best available science to a court in the first instance would be contrary to a fundamental purpose of exhaustion of facilitating judicial review by allowing the agency to apply its technical expertise to such questions.

Further, in both <u>McKart</u> and <u>Frontier Airlines</u>, the question at issue was purely a matter of statutory interpretation and the parties had directly opposing views about how the statute should be interpreted.  <u>McKart</u>, 395 U.S. at 197-98 ("The question * * * [is] solely one of statutory interpretation"); <u>Frontier Airlines</u>, 621 F.2d at 371 ("the question is solely one of statutory interpretation").  By

30

contrast, in this case all parties agree on the applicable regulatory standard – the "consider the best available science" standard of the 2000 transitional regulation. The disagreement is over whether the Forest Service applied that standard or not. This is a question that mixes law and fact.  Proper presentation of the issue to the agency would have allowed the agency to explain more fully how it had applied the best available science standard.

Indeed, the challenges that Forest Guardians did raise in its administrative appeal involved very similar claims that the Forest Service had failed to apply or misapplied governing laws and regulations.  See, *e.g.*, App. 313-14 (arguing that the Forest Service's reliance on the goshawk management guidelines was inappropriate); App. 316 (arguing that the Clean Water Act required establishment of a "Total Maximum Daily Load" for the Rio Vallecitos prior to project approval). Forest Guardians raised these claims even though the agency took opposing legal positions.  The upshot of Forest Guardians' argument here would be that challengers would not be required to exhaust any claims against the Forest Service involving allegations of improper application of laws or standards.  This would largely negate the statutory exhaustion requirement.

Moreover, contrary to cases relied on by Forest Guardians where agencies had adamantly stated opposing positions, here the issue was much more fluid.  As

31

the district court pointed out (App. 87 n.3), the Record of Decision for the Agua

Caballos Projects, released on April 13, 2004, expressly stated that, "[t]he

monitoring plan, like the EIS, is based on the best available scientific information

at this time * * * ."  App. 291.  As this indicates, the agency had already begun a

transition to the "best available science" standard.  Indeed, just two and a half

months after Forest Guardians filed its administrative appeal, the Forest Service

issued an interpretative rule further clarifying that the 2000 transitional regulation

and its "best available science" standard applied to cases such as the instant one.[7]

See supra at 6.  Thus, Forest Guardians cannot reasonably claim that an argument

urging application of the best available science standard in July of 2004, when it

filed its administrative appeal, would have fallen on deaf ears.  To the contrary, had

---

[7] Forest Guardians incorrectly maintains that the Forest Service took a position in the district court that it had applied the 1982 regulations to this decision.  Br. 11, citing USFS Response to Motion for Preliminary Injunction, App. 47.  In fact, the government's response made quite clear that, "at the time of Agua Caballos decisions, the 1982 Regulations were not in effect, and the agency was to apply the 'best available science' standard to ensure that site-specific project decisions were consistent with the applicable Forest Plan."  App. 46.  The government's response went on to note that the Agua Caballos decisions, in fact, could be upheld under either standard, because "in assessing effects of the Agua Caballos Projects on MIS, the agency looked to and applied the more detailed guidance set forth in the 1982 Regulations."  App. 47.  This was plainly not a statement that the 1982 regulations provided the appropriate standard – the brief made clear the government's understanding that the "best available science" standard had supplanted the standard of the 1982 regulation.  See generally App. 45-47.

Forest Guardians raised the issue, the agency would have had a chance to explain in greater detail how it considered the best available science, and how that science supported its decision.

For similar reasons, Forest Guardians is unconvincing in arguing that exhaustion should not be required because at the time, "this Circuit's then prevailing case law still applied the 1982 NFMA regulations to post-November 2000 timber sale decisions."  Br. at 49.  In June 2004, one month before Forest Guardians filed its administrative appeal, this Court issued its decision in United Envtl. Cong. v. Bosworth, 372 F.3d 1219 (10th Cir. 2004) ("UEC 1").   The Court in that case considered a project that had been developed in the late 1990s, and it applied the 1982 regulations, but it specifically noted that, "[i]n 2000, the regulations at issue in this case were changed."  372 F.3d at 1221 n.1.  Judge Baldock, dissenting in part, similarly noted that "while the Court's interpretation of § 219.19 is important to the resolution of the case at hand, the Forest Service's adoption of new planning regulations effectively moots the issue in future cases."  372 F.3d at 1233 n.1.  The Court thus clearly signaled that the new regulations were likely to govern future cases.[8/]

---

[8/] Forest Guardians relies (Br. 49) on Judge McConnell's dissent in United Envtl. Cong. v. Troyer, 479 F.3d 1269, 1288 (10th Cir. 2007) ("Troyer"), to support its argument that there was no reasonable notice of the applicability of the 2000

Forest Guardians' reliance on <u>Bowen v. City of New York</u>, 476 U.S. 467 (1986), is plainly misplaced.  While <u>Bowen</u> addressed a statutory exhaustion requirement (albeit one that was waivable by the Secretary of Health and Human Services), the situation in that case was very different from here.  Plaintiffs in <u>Bowen</u> were disability benefits claimants who had been denied benefits due to a covert policy that denied benefits according to certain presumptions rather than through individualized analyses, in contravention of the law.  476 U.S. at 473-74. The disability benefits claimants in <u>Bowen</u> argued that it was unfair to require them to have exhausted administrative remedies.  In <u>Bowen</u>, there was no way for plaintiffs to have been aware that the policy existed; it was a "systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations."  <u>Id</u>. at 485.  Here, by contrast, the 2000 transitional regulation, which plainly required the Forest Service to comply with its transitional provisions, was published in the Federal Register.  <u>See</u> <u>UEC 3</u>, 443 F.3d at 747 (holding that the plain language of the regulation left "little doubt" that the "best available science" standard applied); see also <u>Forest Watch v. USFS</u>, 410 F.3d 115,

───────────────

regulations until April 2006, when <u>United Envtl. Cong. v. Bosworth</u>, 443 F.3d 732 (10th Cir. 2006) ("<u>UEC 3</u>") was decided.  In fact, Judge McConnell's dissent in <u>Troyer</u> does not state that challengers had no notice prior to 2006, but only that challengers were clearly on notice after 2006.  479 F.3d at 1291.

118 (2d Cir. 2005) (the "plain language of the 2000 Transitional Rule" requires that "projects 'implemented' during the transition must comply with the best available science standard").

In sum, there was no valid excuse for Forest Guardians not to have raised its "best available science" claim in its administrative appeal, assuming that it is possible to excuse non-compliance with a statutory exhaustion requirement in the first place. Indeed, Forest Guardians' argument is inherently inconsistent – it insists that the Forest Service decision should be set aside if the agency failed to recognize that "best available science" was the applicable standard when it issued its final decision, but maintains that a challenger should face no consequences for failing to recognize the applicability of the new standard and thus failing to raise it in an administrative appeal. If the applicability of the new standard was plain enough to hold the agency to it, it was also plain enough to require a challenger to raise it.

The district court concluded its thorough consideration of the exhaustion issue with the following observation: "[t]he Court does not believe that requiring a party opposing agency action to give the agency notice when the agency is applying the wrong law or standard is too great of a burden, especially where Congress has mandated exhaustion, and the plain language of the regulation gives

35

notice of the issue." App. 88. This conclusion is fully consistent with the law of

administrative exhaustion, and should be upheld.[9/]

---

[9/] Due to Forest Guardians' failure to exhaust, the district court properly did not
reach the merits of Forest Guardians' claim. The record in this case, however,
would have supported a conclusion that the "best available science" standard was
applied and met. As noted, supra, the Record of Decision expressly stated that,
"[t]he monitoring plan, like the EIS, is based on the best available scientific
information at this time * * *." App. 291. While not always explicitly labeling it
as such, the Forest Service plainly "consider[ed] the best available science"
throughout the EIS and Supplemental EIS in developing alternatives and
analyzing effects, as the regulation contemplated. For example, the Forest Service
issued a Supplemental Final Environmental Impact Statement entirely devoted to a
discussion of the effect of various alternatives on management indicator species.
App. 209-224. The document clearly outlined the affected habitat, environmental
factors that may change with various alternatives, and how this particular project
may affect the species on the entire Forest. The document identified where the
information is from and relies on a large number of scientific sources. The entire
Supplement used the most up-to-date information. Id. Similarly, Appendix I of
the Final Environmental Impact Statement contains a table of all of the scientific
papers brought to the Forest Service's attention during the scoping and review
process. In the table, the Forest Service discussed each paper and explained why
the paper was or was not applicable to the Agua Caballos Projects authorization.
App 159-64. Forest Guardians points to no instances where the Forest Service
failed to consider the best available science. The Forest Service deserves
deference for its conclusion (App. 291) that it considered the best available
science.

## II.  THE AGUA CABALLOS PROJECTS ARE CONSISTENT WITH NFMA REQUIREMENTS RELATING TO SPECIES DIVERSITY.

Forest Guardians next claims that the Agua Caballos Projects are inconsistent with NFMA because their effect on the Abert's squirrel purportedly violates a substantive duty under that statute to "protect biodiversity."  Br. 51.  This claim is misguided.  First of all, the NFMA provision relating to species diversity applies at the Forest Plan level, not the project level, and Forest Guardians has made no showing that the Carson Forest Plan is deficient in this regard.  Second, while projects must be consistent with the Forest Plan, Forest Guardians has shown nothing to indicate that the Agua Caballos Projects conflict with Carson Forest Plan direction on Abert's squirrels.

### A.  NFMA's Species Diversity Requirement Does Not Apply Directly to Projects.

NFMA requires the promulgation of regulations "specifying guidelines for land management plans developed to achieve the goals of the Program," which, *inter alia*, "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives."  16 U.S.C. 1604(g)(3)(B) (emphasis added).  Thus, the NFMA requirement which aims to provide a diversity of animal and plant communities is focused on the Forest Plan process.  NFMA does not directly apply

37

wildlife diversity requirements to individual projects.  Rather, it requires individual

projects to be consistent with land management plans.  16 U.S.C. § 1604(i).

Nowhere in its brief does Forest Guardians allege that the Carson Forest Plan

is inadequate to achieve the wildlife diversity goals of the Act and its implementing

regulations.  Instead, Forest Guardians argues that the Agua Caballos Projects

viewed in isolation are inconsistent with the NFMA requirement to provide for

species diversity, because of allegedly harmful effects on the Abert's squirrel.  See

Br. 51 ("The A-C project decision violates the USFS's substantive statutory duty to

protect biodiversity").  This claim is plainly misguided, because the NFMA

diversity requirement does not directly apply to particular projects.

Forest Guardians relies (Br. 52) on the Ninth Circuit's decision in <u>Idaho</u>

<u>Sporting Congress, Inc. v. Rittenhouse</u>, 305 F.3d 957(9th Cir. 2002), as allegedly

supporting the proposition that NFMA's diversity provision can be enforced

directly against particular projects.  In fact, that decision confirms that the diversity

requirement applies to Forest Plans, not projects.  See 305 F.3d at 967-70 (finding

that Boise Forest Plan failed to comply with NFMA diversity requirement).  As

<u>Idaho Sporting Congress</u> notes, <u>id</u>. at 962, the obligation placed on individual

projects is to be consistent with the Forest Plan, "which in turn must comply with

the Forest Act."  As we show <u>infra</u> at Section III.B., the Agua Caballos Projects are

fully consistent with the wildlife prescriptions of the Carson Forest Plan. Forest Guardians makes no claim that the Forest Plan violates NFMA requirements relating to species diversity. It simply insists that the Projects violate those requirements. This claim that an individual project does not comply with the diversity provisions of NFMA is not cognizable.

**B.    Even if the species diversity requirement of NFMA applied directly to projects, the record demonstrates that the Agua Caballos projects comply.**

The district court thoroughly reviewed Forest Guardians' claims that the Forest Service acted without proper consideration of species viability concerns, and rejected them. The court found that "the USFS was rational in concluding that the planned project will create a more diverse habitat for the Abert's squirrel, and will provide higher quality habitat and better foraging opportunities," and that accordingly, the Forest Service did not violate any applicable duty under NFMA relating to species diversity. App. 95-96. Assuming Forest Guardians can bring this claim of a NFMA violation at all, it has not shown that the district court erred in rejecting the claim.[10]

---

[10] An independent problem with Forest Guardians' argument is that it incorrectly assumes that NFMA's directive that land management plans "provide for diversity of plant and animal communities," 16 U.S.C. 1604(g)(3)(B), can be meaningfully applied to a single species, such as the Abert's squirrel. In fact, the statutory language makes clear that it applies to "plant and animal communities," not

Based on substantial information and analysis in the Administrative Record, the Forest Service concluded that the Abert's squirrel would benefit from the implementation of the Agua Caballos Projects, because the silvicultural treatments will create a more diverse habitat for the squirrel, providing higher quality habitat and better foraging opportunities.  App. 337-38.  The Administrative Record demonstrates that the Forest Service has gathered a tremendous amount of habitat and quantitative population data.  The central documents summarizing this information are the May 2003 "Management Indicator Species Assessment" ("MIS Assessment") for the Carson National Forest, App. 194-207, and the 2004 "Final Supplement to the Final Environmental Impact Statement for the Agua /Caballos Proposed Projects" ("Final Supplement to the FEIS"), App. 246-250.

_____

individual species.  As made clear in the Record of Decision for the Projects, App. 293, the Forest Service approach to wildlife diversity is based on ecosystem management, not single species management.  Consistent with this approach, the Forest Service in 1996 amended a number of Forest Plans, including the Carson Forest Plan, with the "Management Recommendations for the Northern Goshawk in the Southwestern United States."  Id.  These Management Recommendations describe 14 prey species as being particularly important in the diet of southwestern goshawks, one of which is the Abert's squirrel.  App. 150.  The Recommendations identify a set of desired forest conditions needed to provide abundant and sustainable populations of each of the prey species, and the Forest Service manages the Forest to attain those conditions.  Id.  Forest Guardians' single-minded focus on Abert's squirrel ignores that the Forest Service must manage for many species, as well as the ecosystem, in order to provide for a diversity of plant and animal communities.

In the MIS Assessment, Forest Service biologists collected and assessed information on the Abert's squirrel from several different sources.  See generally App. 197-207.  The biologists first described the habitat types used by the squirrel, both on the Carson National Forest (noting that it occurs "sporadically throughout the ponderosa pine habitat type" and that this habitat type is "well distributed across the Forest") and throughout the Southwest.  Id. at 197.  The Assessment then discussed various management activities that may adversely and beneficially affect the species, as well as the VSS stages (3, 4, 5, and 6) that are believed to provide the best habitat conditions.  Id. at 198-99.

The agency next assessed habitat trends for Abert's squirrel on the Forest, estimating that from 1986 to 2002 the amount of occupied habitat for the squirrel increased from 53,220 to 63,190 acres of interlocking canopies.  Id. at 199-200. Despite this increase, the Assessment notes that "[i]ndiscriminate logging can degrade squirrel habitat," and that "historic heavy harvesting" and fire suppression has resulted in a less diverse habitat in the mid-seral (i.e., VSS 3 and 4) stages, and that therefore the "current habitat condition for this species is poor to fair, but in a slight upward trend."  Id. at 201.  In contrast to historical logging practices that degraded Abert's squirrel habitat, the Forest Service notes that "more recent management has tended to focus on thinning from below" and "group

41

selection[,]"[11] practices that should "enhance[] Abert's squirrel habitat [and] that in turn should assure its survival."  Id. at 202.

The MIS Assessment also looked at quantitative population trend data and viability.  In the United States, the squirrel is "secure and common, widespread and abundant" and in New Mexico is "apparently secure - uncommon but not rare." Id. at 203.  While noting that as of 2002, surveys specific to the Abert's squirrel on the Carson National Forest had not been conducted, information gathered by biologists and other personnel indicated that it was fairly common across its range. Id.  Finally, consistent with the Forest Plan monitoring provisions for game species such as the Abert's squirrel, see App. 145, the biologists noted that harvest data collected by the New Mexico Department of Game and Fish from 1983 to 2001 suggested a slightly downward trend for the species in New Mexico.  App. 204.

Overall, based on the habitat information and quantitative population data, the Forest Service concluded that the Abert's squirrel population on the Forest is "stable, but likely lower than potential" and that the Forest "is sustaining viable populations of Abert's squirrel."  App. 204.  Forest Guardians cannot show that

---

[11] Group selection is a system in which trees are removed in small groups.  This system mimics small-scale natural disturbance and fosters the development of uneven-aged stands, aiding the regeneration of species that are adapted to such conditions.  See http://www.na.fs.fed.us/stewardship/pubs/guidelines/guidelines.htm.

this conclusion is arbitrary and capricious, as it is supported by relevant, substantial evidence and an extensive review of scientific literature.  See <u>Dickenson v. Zurko</u>, 527 U.S. at 162, 164.

In addition, the Forest Service began a monitoring program on the Forest, hiring an expert on squirrels, Dr. Jennifer Frey, from New Mexico State University. Using established sampling techniques, Dr. Frey set up 31 monitoring plots to measure Abert's squirrel densities.  App. 227, 229.  In her 2003 study results, Dr. Frey noted that squirrel populations in the Southwest had "crashed" in 2002 and 2003, likely as a result of severe drought conditions, and that densities on the Forest were approximately twice as low as density estimates in Utah.  Dr. Frey attributed some of this difference to a late start in her study time.   App. 229-30. Although Dr. Frey found no correlation between squirrel occurrence and "general stand data" maintained by the Forest, she also noted that "[v]ariation in habitat characteristics is known to influence squirrel densities" and that "habitat should consist of a combination of tree age classes, with groupings, size, and density that provide all habitat components."  App. 238-39.  The Agua Caballos Projects are designed to do precisely what Dr. Frey recommended.

In her 2004 report, Dr. Frey identified Abert's squirrel densities even lower than in 2003.  App. 344.  Again, however, she attributed this decline to

43

continuation of drought conditions, compounded by <u>historical</u> logging practices on the Forest.  App. 345.  Forest Guardians seizes on the numbers from Dr. Frey's 2003 and 2004 reports to assert that the Forest Service is failing to maintain a viable population of Abert's squirrel on the Forest.  Br. at 29-32.  A decline in a squirrel population as a result of unprecedented drought conditions, however, is not indicative of a failure to maintain viable populations or that the population is exhibiting a long-term downward trend.  On the contrary, such population fluctuations are common with species such as Abert's squirrel, which are extremely sensitive to environmental factors like drought.  App. 239.  Nowhere does Dr. Frey suggest that the population of Abert's squirrels on the Carson National Forest is not viable.

Using the information amassed in the MIS Assessment and Dr. Frey's research results and analysis, the Forest Service looked at the potential habitat conditions anticipated from implementation of the Agua Caballos Projects and concluded that the Projects would benefit the Abert's squirrel both in terms of protecting and increasing high quality habitat and maintaining viable population numbers in the Forest.  This conclusion is rational because the projects will provide for a greater diversity of VSS stages and for a greater number of trees at the higher VSS stages that provide the best habitat for Abert's squirrels.

Consistent with Dr. Frey's recommendations, the Projects will "move habitats towards a more desired condition for squirrels," improving the food sources for the squirrel, and thereby helping its numbers rebound.  App. 338. Morever, the Project sets aside the highest quality habitat for the Abert's squirrel by providing that no harvesting will occur in old growth areas.  Id.  The Record of Decision requires that all stands be surveyed prior to harvesting, and high squirrel activity areas be protected from treatment.  App. 291.

Forest Service experts rationally concluded "that the implementation of this decision will not affect the forest-wide population and habitat trend" of the Abert's squirrel.  App. 338.  Moreover, as the district court correctly noted (App. 98), regardless of the population trend for the Abert's squirrel, the Forest Guardians has not demonstrated that the Agua Caballos Projects will have an adverse effect on these squirrels.  Forest Guardians equates any harvesting of trees with destruction of species' habitat and population, but provide no support for that proposition. Forest Guardians points to isolated statements in Dr. Frey's report regarding the potential adverse effects of intensive, widespread thinning and deem these statements to mean that a decline in squirrel population is at least partially attributable to timber harvesting.  Br. at 54.  However, Dr. Frey's findings that poorer seed and hypogeous fungi production can result from logging that produces

45

smaller denser stands and reduces canopy closure and tree basal area do not apply to the Agua Caballos Projects.  In fact, the Projects are designed to reduce the density of smaller trees and otherwise manage the habitat to improve foraging for Abert's squirrels.  Forest Service biologists found that "[m]anagement practices of thinning from below and group selection across the Forest enhances Abert's squirrel habitat that in turn should assure its survival."  App. 202.  And Dr. Frey noted that "[v]ariation in habitat characteristics is known to influence squirrel densities," and that "habitat should consist of a combination of tree age classes, with groupings, size, and density that provide all habitat components."  App. 238-39.[12]

In sum, because the Projects will improve squirrel habitat, it cannot be said that the Forest Service acted arbitrarily or capriciously, or violated any applicable duty stemming from NFMA.

---

[12] Forest Guardians erroneously relies (Br. 53-54) on figures from a 1984 report which suggest that certain numbers represent viable populations of various species, including Abert's squirrel.  This report is not in the administrative record and was not incorporated into the Carson Forest Plan or the EIS for that Plan.  Moreover, it provides no support for the numbers it sets out.  Dr. Frey, in her thorough 2003 report, lists "typical levels" of Abert's squirrels are one animal per 20 to 40, acres, a density range that is lower than the one squirrel per 6 to 16 acres range set out in the 1984 report.  App. 237.  The Forest Service is obligated to consider the best available science, which in this case is plainly Dr. Frey's report, not the 1984 report.

## III.    THE AGUA CABALLOS PROJECTS ARE CONSISTENT WITH THE CARSON NATIONAL FOREST PLAN.

Forest Guardians maintains that the Agua Caballos Projects are inconsistent with the Carson National Forest Plan because the Forest Service allegedly failed to achieve the Plan's goals for wildlife monitoring and because the Plan allegedly requires the Forest Service to assure that the Abert's squirrel population greatly exceed the minimum viable population.  However, the Forest Plan does not condition the approval of projects on achieving its Forest-wide monitoring goals, and this Court's case law demands such a connection before a claim of deficient monitoring may be brought.  Moreover, the Forest Plan does not require the Forest Service to assure that the Abert's squirrel population greatly exceed the minimum viable population.  In any event, the Forest Service expects that the Agua Caballos Projects will improve Abert's squirrel viability, and thus fulfill any applicable requirements stemming from the Forest Plan.

47

**A.    As the Carson Forest Plan does not condition project approval on compliance with monitoring goals, Forest Guardians' claim of deficient monitoring is not cognizable.**

NFMA requires that projects be consistent with Forest Plans.  16 U.S.C. § 1604(i).  Focusing on the nearly-identical plan conformity provision of the Federal Land Policy and Management Act, the Supreme Court has ruled that, absent a clear indication, aspirational goals in land use plans do not bind an agency.  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 70 (2004) ("SUWA") (statutory requirement that Bureau of Land Management (BLM) ensure its decisions "conform to" land management plans did not permit suit to require BLM to fulfill monitoring plans contained in the land management plan).  The Court stated that "'will do' projections of agency action set forth in land use plans [] are not a legally binding commitment."  Id. at 72.  To the contrary, "a land use plan is generally a statement of priorities; it guides and restrains actions, but does not (at least in the usual case) prescribe them."  Id. at 71 ("a statement by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit  * * *.").[13]

_____

[13]  Indeed, as the Supreme Court noted in SUWA, a judicial decree compelling immediate fulfillment of all of the monitoring goals in the Plan would divert the Forest Service's attention from other projects that may be more pressing.  It would be unreasonable to conclude that plans that commit agencies far into the future are judicially enforceable.  542 U.S. at 71.

Consistent with SUWA, this Court has made clear that Forest Guardians

cannot sue to enforce generalized statements in Forest Plans regarding planned

monitoring. This Court stated in UEC 3 that:

> Ordinarily, a forest plan's forest-wide monitoring
> program is not subject to judicial review because it does not
> constitute final agency action.  Ecology Ctr., Inc. v. U.S. Forest
> Serv., 192 F.3d 922, 925-26 (9th Cir. 1999); see also Norton v.
> S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) (holding
> that Bureau of Land Management's failure to implement an
> off-road vehicle monitoring program was not a final agency
> action).  In limited circumstances, however, we may review a
> monitoring program to the extent it bears on the approval of a
> particular project.  See Ecology Ctr., 192 F.3d at 926 n. 6
> (concluding that plaintiff may "raise claims pertaining to
> inadequate monitoring by bringing an APA challenge to a final
> decision"); Neighbors of Cuddy Mountain v. Alexander, 303
> F.3d 1059, 1067 (9th Cir.2002) ("Of course, not all forest-wide
> practices may be challenged on the coattails of a site-specific
> action; there must be a relationship between the lawfulness of
> the site-specific action and the practice challenged.").  In other
> words, if a project's approval is conditioned upon the
> fulfillment of certain monitoring obligations, a plaintiff may
> bring a claim of deficient monitoring. Without such a
> relationship, a claim of deficient monitoring simply is not
> cognizable.

UEC 3, 443 F.3d at 749 -750 (emphasis added).

After reviewing the Carson Forest Plan, the District Court determined that

the Monitoring Plan's MIS monitoring requirements do not constitute a condition

precedent to project approval and thus the deficient monitoring claim is not

49

cognizable.  App. 94.  This conclusion is correct and entirely consistent with this Court's case law.

The Carson Forest Plan monitoring plan (App. 138-149) states that, "[t]he purpose of monitoring and evaluating the implementation of the Forest Plan is to inform the decision maker of the progress toward achieving the goals, objectives, and standards and guidelines."  App. 138.  The Plan explains that monitoring will determine such things as whether the Forest is achieving the objectives of the Forest Plan.  Id.  It also specifies that more detailed annual monitoring plans will be based on "funds available for monitoring."  Id.  One of the many items to be monitored under the Forest Plan is the population and habitat trends of management indicator species.  App. 142.  The plan contemplates the collection of five years of inventories to provide baseline data, and then further monitoring thereafter.  App. 146.  The wildlife monitoring section concludes: "It should be realized that monitoring of wildlife resources on such a scale as proposed is at best tentative and exploratory."  App. 149.

There is nothing in the Forest Plan that conditions approval of individual project decisions on completion of the monitoring goals.  To the contrary, monitoring reports are developed at the Forest level and are independent of any project authorization.  App. 140, 143. The language of the monitoring plan makes

50

clear that monitoring is meant to inform decision makers about the need for broad

scale changes in the Forest Plan, that actual monitoring plans will be based on

available funds, and that monitoring goals are tentative and exploratory.[14]  As the

District Court pointed out, were project authorizations conditioned on completion

of monitoring plans, the Forest Service would have been in violation of NFMA's

consistency requirements the year after the Forest Plan was adopted, since the Plan

projected timber projects beginning in 1987, well before the five years of baseline

information could have been gathered.[15]

_____

[14]  Forest Guardians recognizes (Br. 57) that the purpose of monitoring is to
determine how the natural environment is responding to Forest Service
management actions.  Monitoring is not tied to project approval but to post-project
assessments that may drive changes in the Forest Plan.  Forest Guardians
improperly seeks to challenge the Forest Service's general achievement of the
Plan's monitoring program through litigation aimed at a specific project.  See
SUWA, 542 U.S. at 64 ("[plaintiffs] cannot seek wholesale improvements of this
program by court decree") (emphasis in original).

[15]  Moreover, as the Forest Service's 2003 MIS Report points out:

> Population trend is most appropriately addressed at scales above the
> project level. . . .  Evidence from long-term censuses suggests that
> few natural populations or communities persist at or near equilibrium
> on a local scale.  At a site specific project level, there is a great deal
> of fluctuation in wide ranging populations.  For this reason, it is not
> appropriate to determine population trend at the local level.  For
> National Forest Management Act implementation, population trend is
> addressed at the scale of the Carson National Forest.  Even at this
> level, population trend information is not likely to be indicative of
> overall population trends of a species.

Forest Guardians cites no provision of the Forest Plan that comes close to making implementation of specific monitoring measures a condition of project approval.  Instead, it simply contends (Br. 60-61) that this case is governed by this Court's decisions in <u>Richmond</u> and <u>UEC 2</u>.  Those cases are easily distinguished, however.

In <u>Richmond</u>, this Court specifically stated that, "[w]e may only review a monitoring program to the extent it bears on the approval of a particular project." 483 F.3d at 1134.  The Court was satisfied that the plaintiffs in that case had established the required nexus between monitoring and the project's approval.  <u>Id</u>. The Plan at issue in <u>Richmond</u> required further evaluation of certain populations and a change in management direction in the event of a 20 percent reduction in population, or if an index measuring habitat condition dropped below a certain level.  483 F.3d 1133.  Thus, the Court found that the plan in that case set a specific standard that effectively made monitoring a condition precedent to management activities.

Similarly in <u>UEC 2</u>, the applicable Forest Plan "mandate[d] that the Forest Service annually monitor by visual reconnaissance any threatened, endangered, and sensitive animals * * * to ensure 'no decrease attributed to management

---

App. 195-96.

activities.'"  439 F.3d at 1194.  The district court in this case correctly pointed out

that the Fishlake Forest Plan at issue in <u>UEC 2</u> contained species monitoring

requirements that were specifically applicable to project-level decisions.  App. 92,

citing Fishlake monitoring plan at Table V-1 & V-3, attached as Exhibit B to

Federal Def. Notice of Supplemental Authority (App. 49).  These requirements

rendered monitoring of threatened and endangered species a condition precedent to

project approval, because they created a standard that could only be complied with

through monitoring.

   Like the Forest Plan in <u>UEC 3</u> and unlike the Plans in either <u>Richmond</u>  or

<u>UEC 2</u>, the Carson National Forest Plan contains no language that conditions

project approval upon monitoring or that creates a standard that can only be

complied with through monitoring.[16] Accordingly, the district court correctly

---

[16] Moreover, <u>Richmond</u> permitted a challenge to monitoring in part because
monitoring data was required in that case to demonstrate the adequacy of the
agency's compliance with the National Environmental Policy Act (NEPA).  See
<u>Richmond</u>, 483 F.3d at 1135 ("[w]ithout pre-decisional [monitoring] data * * *,
the Forest Service  could not have fully evaluated whether the project's mitigation
measures [contained in the EIS] were adequate").

   In <u>UEC 3</u>, the fact that the challenged project was approved pursuant to a
NEPA categorical exclusion underscored the fact that monitoring data was not
necessary.  <u>UEC 3</u>, 443 F.3d at 750.  Nothing in the Court's opinion, however,
limited its holding – that a monitoring claim is only cognizable if a project's
approval is conditioned upon monitoring – to situations involving NEPA
categorical exclusions.

rejected Forest Guardians' attempt to claim that the Agua Caballos Projects are

inconsistent with the Forest Plan monitoring plan.

### B.    The Agua Caballos Projects are fully consistent with the substantive direction of the Carson Forest Plan.

As discussed supra at 39-46, the Forest Service reasonably concluded that

the Agua Caballos Projects will improve habitat for the Abert's squirrel.  In its

Wildlife Section, the Carson National Forest Plan states that one of its goals is to

"[m]aintain habitat for viable populations of all wildlife and fish species found on

the Forest and improve habitat for selected species."  App. 135.  It further states

that "[t]his will be accomplished indirectly through intensive coordination of

habitat manipulation with other resource activities, and directly through intensive

habitat management."  Id.

To accomplish this goal, the Carson National Forest Plan directs the Forest

Service to "[e]stablish and maintain stand diversity through integrated stand

management to maintain and improve wildlife habitat diversity and specific habitat

components in lands suitable for timber and firewood production."  App. 136.  For

the Abert's squirrel, the Plan states that "[b]y creating a diversity of stand

conditions and providing juxtaposition of stands over time and space, suitable

habitat components of Abert and red squirrels will be maintained over time."  App.

137.  It further directs that "[d]uring the intensive reconnaissance phase of integrated stand management State and Federal biologists should identify those stands where squirrel activity is especially high and recommend deferment of cutting during the entry."  Id.

The Agua Caballos Projects derive directly from the substantive direction of the Plan.  They are designed to promote "stand diversity through integrated stand management" and to improve wildlife habitat by improving "specific habitat components" such as clumps of larger trees.  The Record of Decision also requires biologists to survey stands where squirrel activity is especially high and the Forest Service to protect these stands from treatment.  The Carson National Forest Plan recognizes that management to produce a variety of stand types will be necessary to promote species diversity.  The Agua Caballos Projects accomplish just that.

Contrary to Forest Guardians' assertion (Br. 57-58), the Carson Forest Plan does not contain a requirement that the Forest Service assure populations of MIS "greatly exceeding minimum viable populations."  This phrase is found in the 1986 final environmental impact statement (EIS) for the Forest Plan, which makes a long-term projection that the Forest Plan will result in populations of MIS greatly exceeding minimum viable populations.  See App. 196 (MIS report quotes from EIS at p. 152).  As the district court correctly noted, the EIS for the Forest Plan is

55

not part of the Forest Plan itself, and thus the consistency requirement of 16 U.S.C. § 1604(i) is not applicable.  App. 94-95.  Forest Guardians makes no attempt to rebut the district court's reasoning, but simply repeats its erroneous assertion that the Forest Plan contains a "greatly exceeding" requirement.  It does not.

**CONCLUSION**

The judgment of the district court upholding the Forest Service's decision to

approve the Projects should be affirmed.

                              Respectfully submitted,

                              RONALD J. TENPAS
                              Acting Assistant Attorney General

OF COUNSEL:                   MARK R. HAAG
                              ANDREW A. SMITH
KATHRYN TOFFENETTI            DAVID C. SHILTON
MARY ANN JOCA                 Attorneys, Department of Justice
Office of General Counsel     Environment & Natural Resources Division
U.S. Dept. Of Agriculture     P.O. Box 23795, L'Enfant Station
Washington, D.C.  20026        (202) 514-5580
                              david.shilton@usdoj.gov[17/]

90-1-4-11566
NOVEMBER 2007

---

[17/] Susannah Foster, a student at Georgetown University Law Center, substantially
contributed to the drafting of this brief.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States believes that oral argument may aid the Court in understanding the issues presented in this case.


    /S/          
David C. Shilton

# Certificate of Compliance

Please complete one of the sections:

**Section 1.  Word count**

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains <u>12,714</u> words.

Complete one of the following:

  <u>X</u>   I relied on my word processor to obtain the count and it is [name word processor software]: <u>Wordperfect 12</u>.

  <u>     </u>   I counted five characters per word, counting all characters including citations and numerals.

**Section 2.  Line count**

My brief was prepared in a monospaced typeface and contains _____ lines of text.


I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

<u>/S/</u>_____
David C. Shilton

## Certificate of Service

It is hereby certified that an original and seven copies of this brief were mailed to the Clerk by First-Class Mail on this 20th day of November, 2007, and that service of this brief was made on counsel for the appellants by sending them a copy by e-mail in PDF format, properly addressed to sugarman@bs-law.com, and two paper copies in an envelope properly addressed to them as follows:

> Steven Sugarman
> Alletta Belin
> BELIN & SUGARMAN
> 618 Paseo de Peralta
> Santa Fe, New Mexico 87501

It is further certified that this brief has been submitted in PDF format by e-mail to esubmission@ca10.uscourts.gov; that all required privacy redactions have been made and, with the exception of those redactions, the digital submission of this brief is an exact copy of the written document filed with the Clerk; and that the digital submission has been scanned for viruses with the most recent version of a Computer Associates eTrust InoculateIT, version 6.0.96, updated through November 20, 2007, and, according to the program, are free of viruses.

_____/S/_____

David C. Shilton

## STATUTORY AND REGULATORY ADDENDUM

1.  The Department of Agriculture Reorganization Act, at 7 U.S.C. § 6912, provides, in relevant part:

**(e)  Exhaustion of administrative appeals**;

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against -
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

2.  Section 6 of the National Forest Management Act, 16 U.S.C. § 1604, provides in relevant part:

**(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans**

As soon as practicable, but not later than two years after October 22, 1976, the Secretary shall in accordance with the procedures set forth in section 553 of Title 5, promulgate regulations, under the principles of the Multiple- Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528 to 531], that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to--

> (1) specifying procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.], including, but not limited to, direction on when and for what plans an environmental impact statement required under section 102(2)(C) of that Act [42 U.S.C.A. § 4332(2)(C)] shall be prepared;

> (2) specifying guidelines which--

61

(A) require the identification of the suitability of lands for resource management;

(B) provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids; and

(C) provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternative activities;

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which--

(A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

(B) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

* * * * *

**(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision**

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as

practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

    * * * * *

3.  36 C.F.R. § 219.35 (2001), provided:

§ 219.35 **Transition.**

(a) The transition period begins on November 9, 2000 and ends upon the completion of the revision process (§ 219.9) for each unit of the National Forest System.   During the transition period, the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan.

(b) Until the Department promulgates the revised final planning regulations announced in the December 3, 2001, Semiannual Unified Agenda of Federal Regulatory and Deregulatory Actions, a responsible official may elect to continue or to initiate new plan amendments or revisions under the 1982 planning regulations in effect prior to November 9, 2000 (See 36 CFR parts 200 to 299, Revised as of July 1, 2001), or the responsible official may conduct the amendment or revision process in conformance with the provisions of this subpart.   For the purposes of this paragraph, the reference to initiation of a plan amendment or revision means that the agency has issued a Notice of Intent or other public notification announcing the commencement of a plan amendment or revision as provided for in the Council on Environmental Quality regulations at 40 CFR 1501.7 or in Forest Service Handbook 1909.15, Environmental Policy and Procedures Handbook, section 11.

(c) If a review of lands not suited for timber production is required before the completion of the revision process, the review must take place as described by the provisions of § 219.28, except as provided in paragraph (b) of this section.

(d) Site-specific decisions made by the responsible official 3 years from November 9, 2000 and afterward must be in conformance with the provisions of this subpart.

* * * * *